Good morning, Your Honors. May it please the Court, my name is Christopher Winter, and I represent the appellants Greenpeace and Cascadia Wildlands Project. I'd like to reserve five minutes for rebuttal, if I could, this morning. Your Honors, I'd like to spend our time in argument today focused on two main issues central to this case. The first is the Forest Service's failure to comply with the 2000 National Forest Management Act regulations that require consideration of the best available science. The second main issue I'd like to focus on is the Forest Service's failure to comply with the 1982 National Forest Management Act regulations, which were incorporated into the Tongass Land Management Plan when it was issued in 1997. Now, this is the proxy on proxy issue, which we'll discuss in a few minutes. Now, first, turning to the best available science, the central issue is the information on old growth forest conditions that the agency was using to manage for wolves and deer in making project-specific decisions. Known as Volstrata, the Forest Service's own scientists had concluded that this information on old growth was inaccurate and could be misleading when used for determining wildlife habitat quality. What's your best citation to the record for the fact that, or the assertion that you're making, that the Forest Service knew that the Volstrata system was inherently flawed and could not accurately measure the deer habitat? Yes, Your Honor. So in January of 2007, the Forest Service released a draft environmental impact statement for the revisions to the Tongass Land Management Plan, and this is in the excerpt of record at page 204. At that time, and I will quote from the document, the Forest Service stated that Volstrata, and I quote, may be misleading when describing wildlife habitat. This is in the excerpt of record at page 204 in January of 2007. This is the agency's own public statement during the revision planning process, that Volstrata may be misleading and is inaccurate. Now at that time, the agency explicitly abandoned using Volstrata for this specific purpose of modeling for deer habitat and wolf viability. At that time, it ran the model using the new size density information, which was developed by its own scientists, Kay Wett et al., and their 2005 study. And the Forest Service, in addition, concluded that, in fact, there were fewer acres of high-quality winter habitat on the landscape than previously believed based on that inaccurate information. Here's why I'm asking, and maybe opposing counsel can be thinking about a response to this as well. It seems to me that if the agency has something that it considers pretty good and they come up with something a lot better, then maybe the something that was pretty good still counts as the best available science at the time, because we're constantly learning things, or at least we try. By contrast, if the agency knew that it was using something that wasn't any good, then it's not science, or it's not available, or it's not relevant, or it's not something. So I guess that's the point that I'm trying to get at with this question. Did they just improve something that was not great into something that was much better, or did they realize that they had dealt with something that was no use at all? Yeah. Thank you, Judge Graber. And I think there's two responses to that. The first response, I would just say, is that under SECV chainery, the application of the best available science requirement has to be in the record for these decisions. And so I think going to the record and seeing was this requirement even applied in the first instance is the first question for the court. And certainly here, it's not set forth anywhere in these decision documents how this requirement was applied. Now, the second point you asked really gets to was this reasonable information that the Forest Service could rely on, or was this information really, truly inaccurate and unreliable? And so in addition to the Forest Service's own statements. I want to stop you there, counsel, and I'd like to continue just a minute. But you gave us the site of ER 204. Yes. I'm looking at ER 204. I can't find it. Maybe I'm just not looking at the right place. I apologize for that, Your Honor. I will find that site for you in my rebuttal. It certainly is in the draft environmental impact statement for the 2000 T-lump revision process, but I will certainly find that for you for my rebuttal. I apologize for that incorrect site. So getting back to this question of whether Volstrada was simply inaccurate or was it potentially reasonable to rely on it, in 2005, the agency's own scientist, published their study, and I quote again from that study. It says, Volstrada masks critical information relevant to modeling wildlife habitat. So this was the agency's own science, and that's in the excerpt of record at page 690. In 2006, the Alaska Department of Fish and Game wrote to the Forest Service as part of the Tongass Conservation Strategy review process and stated at that time, and again I quote, that Volstrada incorrectly identifies high-volume forest stains. This was the Alaska Department of Fish and Game's opinion, which followed up on the agency's – What's the site for that? Excerpt of record at page 436. So there are – and then as far back as 2000 was the original study that the Forest Service scientists published, which also concluded that Volstrada masked information relevant to modeling wildlife habitat. It's clear that the Forest Service thought that Volstrada was flawed and intended to replace it. It was still in development of another data set. But as I recall, they had also been enjoined from using certain things. So Volstrada appears to be sort of one thing that was at hand that they could use, and either they just have to stop making decisions because they don't have perfect data or they have to go with the best data they've got. I think this is a follow-up to Judge Graber's question. Yes. It does appear that everybody concedes, including the Forest Service, this wasn't a perfect set of data. What makes it not the best science available at the time? Was there a better data set? What was the alternative? Yes, Your Honor. So there were two alternatives with respect to the best available science. And there's a third alternative with respect to the proxy-on-proxy approach in the 1982 regulations. With respect to the best available science, there were two alternatives. The first alternative was TIM-type. That was the information on old growth that was used in the original version of the model, the storing version. Now, the Forest Service relies on an opinion from the District of Alaska, which you just referred to, which said it was arbitrary for the Forest Service to rely on that data to estimate timber volume, not wildlife habitat. So the prior decision from the District of Alaska had nothing whatsoever to do with using that original data that the DEER model was based on for estimating wildlife habitat. That opinion related only to the timber volume process. And so the Forest Service absolutely could have used TIM-type. That's what its original scientists suggested in 2000. That's what the Alaska Department of Fish and Game also suggested. So that was certainly more reliable and was readily available for use. Now, the second option was the size-density information, which included a consideration of both tree size and density, which is a better predictor of wildlife habitat. Now, the Forest Service said in its response brief that that information wasn't ready to be used yet at the time these decisions were made. Well, the record simply does not bear out that argument made on appeal. As I mentioned earlier, in the draft environmental impact statement in January of 2007, before any of these appeals were resolved, the Forest Service already stated publicly on the record that size-density was the best tool to be used. And I quote, best tool. It had already used that information in preparing the draft EIS for the management plan. And it had already stated that it was no longer going to use VolStrat. So there is no dispute in the record. It was clear the Forest Service was already using this information. So the Forest Service is using two different sets of information at the same time. In the forest revision process, it's telling the public that the new information is best. It's telling the public that the VolStrat is inaccurate and unreliable. And yet at the same time, in these project-specific decisions, it's not applying the best available science requirement at all in the record. And it's moving forward with using what it now concedes is inaccurate data. And so based on SECB chainery, at bare minimum, the agency should be asked to set forth in the record its explanation of how the best available science requirement applies to these four decisions. And that simply wasn't done here in this case. And so we would ask that the court look at similar situations from the Second and Tenth Circuits, where those circuit courts have also remanded to the agency so that the Forest Service has an opportunity to explain on the record whether the information it was using was the best available science. And that's the Utah Environmental Center case, Ecology Center, and Forest Watch. And we think that those are all very relevant for the court's determination. I'd also like to make two other quick points. First, I'd like to dispel the agency's attempt to characterize this dispute as a, quote-unquote, hyper-technical disagreement over merely citing to the best available science requirement. In fact, in this case, the agency never even mentioned this requirement or regulation until well after the records had been closed. Well, it also made a substantive change in the calculation of the habitat. That's right. It changed. The agency also here admits, in fact, that the habitat is of much lower quality than it originally assumed in the decision documents. And then, finally, on this point, I'd also like to clarify that the agency has been offering a moving target as to which regulations apply. In the decision documents, there was no mention at all of these requirements. Before the district court, the agency conceded, yes, the best available science requirement applies. And then on appeal, it actually backpedaled and said, no, it doesn't apply to two of these decisions. In fact, it's the 2005 regulations, which were enjoined by the Northern District of California. Now the agency's position on appeal for the first time is that those regulations apply to two of the sales. And so the agency has been offering a constantly moving target with respect to which regulations apply. I'd also like to touch on the 1982 rules, which were incorporated into the Tongass Land Management Plan, which is the proxy-on-proxy issue. And, Your Honors, on this point, the case we have before us today is controlled directly by this Court's decision in Lance Counsel v. Powell, 395 F. 3rd, 1019, which is from 2005. In that case, this Court struck down the agency's decision, and I'll quote, because the Forest Service's main tool for old growth calculation was inaccurate. This is 395 F. 3rd, page 1036. So if the habitat information is inaccurate, the Forest Service cannot use habitat information alone in place of conducting actual population surveys. And so, Judge Bivey, your question earlier was, well, what is the alternative if there are some competing sets of information? And with respect to the 1982 regulations, the alternative is for the Forest Service to actually conduct population surveys for these species, these important, critical, old-growth-dependent species, to actually collect population information instead of simply relying on inaccurate information on habitat. And so, again, we also have the agency's own admissions in the record, in its answer, that the actual carrying capacities of these project areas is far lower than what it suspected they were at the time it made its decisions. So that also shows directly that this habitat information was unreliable and inaccurate. And so, again, on... Here, Counselor, are you referring to the deer models, or are we on to something else? So, yes, Your Honor. So I'm referring to our opening brief at page 52 and our reply brief at page 15. And at those citations, we clarify that, for instance, in the planning documents for these sales, for Traders' Cove, for instance, the Forest Service predicted that the wildlife analysis area could support 21 deer per square miles. That's in the excerpt of record at page 225. The correct calculations based on using size density and a correct application of the deer multiplier is actually 9.5 deer per square miles. This is all in the record. That's in the excerpt of record at page 110. So the record demonstrates that the habitat calculations that the agency was using, instead of conducting population surveys, that those habitat calculations, which are set forth in the decision documents, are, in fact, inaccurate. They are, in fact, inaccurate. And in its answer, the Forest Service agrees with the allegations in our complaint about the actual carrying capacities of these areas being different from what was set forth in the decision documents. So two other quick points on the 1982 regulations. First, the Forest Service made an argument in its answering brief at page note 7 that the 1982 regulations did not apply at the project level. That argument was plainly rejected by this court in Inland Empire Public Lands Council, which is 88F3754, page 760, note 6. So that argument directly conflicts with binding precedent from the circuit. And, in fact, the 1982 regulations do clearly apply at the project level. And, finally, I would just like to note that the Forest Service claims it relied on survey information to manage for management indicator species, deer and wolves. And, in fact, the Forest Service has no survey information on wolves, so it offered nothing about wolves. And, second, the survey information for deer were never intended to and haven't been used to document deer populations, just the presence of deer in the planning areas. And I'll quote from the agency's own documents that said, harvest statistics and pellet surveys would not meet monitoring objectives. And that's in the supplemental excerpt at page 212. So with that, I'd like to save the remainder of my time for rebuttal. You may do that. Thank you. Good morning, Your Honors. May it please the Court. Charles Scott on behalf of the Forest Service. Your Honors, this appeal concerns the Forest Service's complex scientific determination of how best to assess the effects of these four projects on habitat for deer that serve as both prey for both hunters and for wolves. This is a complex area in which the Forest Service's deer model has consistently been refined to respond to the best available information. And the appellant's two substantive arguments can point to no clear error of judgment, which is what is required to invalidate agency action. Well, there are two things that I'd ask you to respond to there. The first is that you had to at least explain why you thought that you were using the best available science, not just to us, but in the actual decision and that that hasn't been done. But the second is the question that I asked opposing counsel, which is did the Forest Service discover that the Volstrata was useless and therefore not science at all, best or otherwise, or was it, you know, not too bad, not too good, now it's better. And I was looking at ER 204 and I didn't find the phrasing of misleading or inaccurate, but I do find two places where the Strata approach is described as not particularly useful for wildlife habitat under the size density model description. So I know those are kind of open-ended questions, but if you could address both of those, I'd appreciate it. If I could address this, Your Honor, in terms of there are two substantive challenges pertaining to Volstrata. The first is it was not the best available science under the National Forest Management Act. And the second is it was not its use made the DEER model an unreliable proxy for habitat, also in violation of the NIFMA regulation in the Forest Plan. So let me address those in turn, in sequence if I can, and please tell me if I've omitted any of the points you want addressed. The first point is the appellants here conceded that at the time the projects were undertaken, this new size density model information was not available. And I'd refer you to page 33 of their opening brief that says this information was not available. And then I would also refer you to page 180 of the excerpts of record. That is where they come up with their alternative calculations of what the DEER habitat capability actually was. Their letter, which is on ER 180, is dated July 2008. And on page 180 they say this information is from, quote, unquote, late 2007, i.e. after the administrative processes for these four projects were completed. It is true that the January 2007 draft environmental impact statement for the Forest Plan revision says that the forest was in the process of revising its vegetation classification. But I would point to pages 74 and 77 of the supplemental excerpts of record saying that this will likely not be completed by the time the Forest Plan revision is undertaken. I'm going to stop you to get you to focus in on two specific aspects of what you've just said. The first is whether there is a recognition before the decision is made that the former method is just flat-out inaccurate. That is, it's not just a little bit too, not as good as it could be, but it's really bad. And the second is that Mr. Winter also was referring to other existing science at the time of the decision and the failure to explain why the one you chose was the best. I think that brings me into the, this crosses over and shades the line partly between what is the best available science and is this science reliable. These are the two NIFMA inquiries here. And what I would say, Judge Bybee referred to recognition that Volstrata is flawed. Respectfully, I would disagree that the Forest Service ever said that Volstrata renders the DEER model not reasonably reliable, which is what this Court requires under the en banc lands counsel B. McNair decision. On pages 198 to 200 of the supplemental excerpts of record, we have a published Forest Service study from 2005 indicating that there was a correlation, a statistical correlation between the Volstrata information and DEER habitat selection. So the notion that Volstrata was flawed, I think, is not correct. A second point I'd like to make on that is, if you look at page 690 of the excerpts of record, the draft environmental impact statement says, Differences in forest structure are more useful because timber volume may be misleading when describing wildlife habitat or other attributes of the stand. Not... Which page is that? That's, oh, I'm sorry. That's ER 204. That does not say Volstrata is unreliable. It says reliance on timber volume may be misleading. That's something that the Forest Service acknowledged back as early as the 1997 environmental impact statement for the forest plan. That's... I think that's the section that Mr. Winter was referring to. Yes. There are two other sentences that are potentially relevant, too, but it's not as useful for the explanation of wildlife habitat models. Well, again, what it says is timber volume may be misleading. And the two 2000 and 2005 Forest Service studies that are cited in Greenpeace's brief, one of those is at ER 690, again says timber volume alone may not be... is not equivalent to forest structure. Forest structure may be more useful. Again, we have a 2005 study showing that the Volstrata categories are statistically correlated with deer habitat selection, SCR 198 to 200. I'm sorry, and I know that you all know this really, really well, and some of us are sort of neophytes at all of this. So the timber volume is the Volstrata data? The Volstrata system incorporates timber volume classes, tree size, along with two other factors, slope and whether the soil is hydric or not. In turn, the Volstrata information is incorporated as one of four variables in the deer model, which looks at vegetation type, snow depth, elevation, and aspect. What's aspect? Aspect is the direction, the cardinal point towards which a slope faces. Okay, south, north, whatever. So I do want to find this site to the 1997 EIS. It starts at 858. Am I in the right thing? Well, I'll find the site in a second. The pertinent point is back in 1997, the agency said, and it is in the brief, reliance on timber volume alone may not be the best system. But that's not what we did here. As I've said, Volstrata incorporates volume class, soil type, and slope, and the timber model, in turn, incorporates three other factors, including aspect. The studies from 2000 and 2005, including what Opposing Council has cited today, say that timber volume alone may be misleading. They do not in any way show timber volume alone was not what the Forest Service was using, and none of these studies in any way shows that the deer model was unreliable because it incorporated information from the Volstrata system. To the contrary, again, that 2005 study, SER 198 to 200, said there is a consistent statistical relationship. The best available science requirement does not require an agency to seek out or to obtain information that would be better but is not currently available, and the cases I'm citing for that would be Greenpeace Action, Stop H3 Association, Northwest Ecosystem Council. Okay, what's your response to Council's argument that there were, in existence at the time of this decision, better ways to do it? The first method, excuse me, that he pointed to was SER 341, the District of Alaska decision from 1994 striking down Timtype. Timtype, the court ruled, and it's on 341, was not reliable for a site-specific application. The notion that the Forest Service should have gone back and begun reapplying a system that a court had found not accurate for site-specific applications would, at the very least, probably expose the Forest Service to additional litigation on future timber sales. So no one suggested returning to Timtype except for the Alaska Department of Fish and Game, which said Timtype may be better than volume alone, but in that same breath it sort of acknowledged that the system then available was Volstrad, and I believe that's ER 436 or 437. The other method suggested, again, was you should start using the new size-density model. As I said, on page 33 of their brief, they concede that this information on which they based their alternative calculations was not available and ER 180, they built upon that and explained that it was not available until late 2007. Yes, the Forest Service was considering this, was beginning to use information from the size-density model as it was revising the forest plan in 2007 and 2008. That does not mean that the Volstrada, that does not mean that the size-density model information was, in fact, available at the time of the project analyses here. The record shows the opposite. Nor, again, was there an indication that it was improper to rely on Volstrada. Again, judged by the, I'm going to say, the notion that it would be flawed to rely upon the DEER model because of the Volstrada information is not supported by the record. That 2005 study finds a statistical correlation, and the Forest Service has explained that volume is only one of the factors in its analyses, one of the elements of Volstrada and, in turn, one of the elements of the DEER model. I want to clarify something on opposing counsel's point that the Forest Service has violated the 1982 population monitoring requirements. To be clear, what our brief says, and this is footnote 7, what our brief was intended to say, perhaps it was inarticulate. I concede that this court in Inland Empire said that 1982 regulations do apply at the project level, and subsequent to that it has said the 1982 regulations have been superseded, but to the extent that they have been incorporated into a forest plan, they still apply. In Lands Council v. McNair, and in Inland Empire, frankly, the court did hold that that doesn't mean you have to conduct actual population monitoring associated with a project in order to sustain wildlife viability analyses. McNair says we defer to the agency's explanation of what evidence is or is not necessary for these, as long as it's a reasonably reliable method. And I think the record amply shows that the DEER model, even incorporating Volstrada information, was reasonably reliable. Would you turn to the problem that the Forest Service seems to have used sort of different kinds of multipliers and different bases of numbers of DEER, and I have to say I'm not sure I can find the explanation for why they've used the different numbers they've used. I would like to say at the outset, the same scale and multiplier was used for all four projects here. And the scale and multiplier was what? The Habitat Suitability Index scores range from 0 to 1.3. This was a scale set by two interagency expert panels convened by the Forest Service in 1995 and 1996. The Forest Service initially started with a scale that went from 1 to 1.0, but in 1995, these interagency experts voted or recommended a method that actually went up to 1.3. And I should be clear, if you look at supplemental excerpts of record 215, the score of 1.0 is correlated with optimal habitat assuming average snow conditions. A score above 1.0, 1.3, applies to low snow conditions. Scores above 1.0 are really outliers in the system. I think the project data here showed that less than 1 percent of the project areas here, excuse me, the larger analyses areas here were, in fact, above 1.0. But so, Judge Bybee, the scale was set in 1996. It hasn't been changed. It hasn't been changed until the 2008 forest plan, which, for the sake of simplicity, changed the scale back from 1.3 to 1.0, which I'm told is sort of a concession to standardization and ease of use. That doesn't show that it was arbitrary and capricious to use 1.0. But the tier multiplier numbers that they were using sort of went all over the board. It started with 100 and went down to 75 and up to 125 and then went to 100. It's like an admissions officer at a law school saying we're going to fiddle with the indexes, how we weight GPA and LSAT, and then adjusting both of them in a way that either admits everybody or admits nobody. When you said earlier that requiring the agency to wait for data to become available would prevent it from acting while it waited to complete analyses, I think this change in the multiplier is a reflection of the fact that since 1992, the Forest Service has been revising the multiplier in response to expert scientific opinion. The first multiplier was set at, I think, 70, 80, or 100 for scores of 1.0, depending on snow depth. That was in 1992. In 1995, they had data showing that long-term capacity was ranged from 70 to 100, and therefore they conservatively assigned a score, a multiplier of 75. Then in 1996, the panel reconvened, these interagency experts, and they voted or they agreed to raise the multiplier from 75 to 125. That was based on new data that showed a range, an actual range, an actual estimate of 70 to 185 deer. And then in 1997, the biologists, two of whom had actually – one of whom had provided that 70 through 185 data, said, no, you should change this multiplier to 100. So all the projects here used a 0 to 1.3 scale, a multiplier of 100, so that the maximum available score was 130, and the excerpts of records cite for that. Supplemental excerpts of the record, 155, I think states that explicitly. The scale and model did change, Judge Bybee. They changed in response to the advice that the Forest Service was getting from the community of scientific experts on wolf and deer biology from both inside and outside the agency. At no point did the Forest Service deviate from those recommendations. The only people who said that the wrong scale and multiplier was used as to these four projects are the appellants themselves. In fact, they cite some comments from the Alaska Department of Fish and Game on a broader Tongass initiative. But again, if you look at page 154 of the excerpts of record, the Alaska Department of Fish and Game, in its comments on the Overlook Project environmental assessment, says the scale goes from 0 to 1.3, with 1.3 being the optimal score and a multiplier of 100 being assigned. And on page 155 of the supplemental excerpts, the very next page, the Forest Service confirms, yes, you're right. So the Alaska Department of Fish and Game – At one time, did we have a deer multiplier of 125? Yes. Well, if you had a 125 times 1.3, that ends up with a much larger number. Yes. That had been the recommendation of the 96th Expert Agency Panel. It was then reduced based on the 1997 biologist letter. Is this just coincidence that 1.3 times 100 is very close to 1.0 times 125? I mean, it looks to me like you were trying to get to a number where you thought your carrying capacity was largely someplace around between 100 and 125 deer per square mile and that you were adjusting either the deer multiplier or the HSI in order to describe an optimal section of land. And what you ended up with at some point was 1.3 times 125, which is then too big. This was a model that started out perhaps looking simpler than it did by the time these projects were undertaken. On that specific point, the scale was changed to 1.3 in 1995. The multiplier in 1995 was set at 75. The next year, the panel... 1.3 times 75, as I recall, comes out very, very close to 100. I haven't done that calculation myself. And, again, maybe it's just coincidence, but it sure looks like that's an approximation, and that would be about what your scientists were telling you at the time was the carrying capacity. It was about 100 deer per square mile. The Forest Service does have... It's entitled to some presumption of regularity and good faith. And when you say your scientists, I want to be clear. The 95 and 96 panels and the 97 biologist letter, these are the recommendations upon which changes to the deer model were made, were from scientists both inside and outside the Forest Service. So I think it probably just is coincidence. This was a process that has evolved since 1992. Where in the record does the record indicate that around 130 is an appropriate carrying capacity? The Forest Service explicitly says that the maximum possible on the 1.3 scale is 130. That's at page 155 of the supplemental excerpts of the record. SCR 155? 155.  Those were documents, science from the Alaska Department of Fish and Game, that theorized that overall long-range carrying capacity could range from 70 to 185. That is at ER 872, I believe. The Forest Service did not use a multiplier that went out to 185. The scale ends up at 130. I really do think that, appearances aside, where this ended up was not so much coincidence as continued reliance on what the outside scientists and experts were telling them. And, again, the only party that's saying they got it wrong as to these four projects were the appellants themselves. The letter from the 1997 biologist that they attempt to introduce for the declaration, page 31 of the excerpts of record, that's inadmissible because it is being introduced to show that agency action is arbitrary and capricious. And I would cite to ASARCO v. EPA, which is a 92 case, 616 F2nd at 1160. You can supplement the record with additional information where it's necessary. Furthermore, that declaration on page 31 says, this study clearly meant that you were supposed to change the multiplier so that it applied at a score of 1.3. But if you look at the actual scientific report from scientists Persson and Kirchhoff, page 843 to 844 of the excerpts of record, that document says you should change the scale, or, excuse me, it says you should change the multiplier from 125 to 100. That's what the experts said. The Forest Service did it. It does not say you should change the scale from 1.3 to 1.0. At every step of the way, the Forest Service followed the recommendations of the experts in establishing the deer model that it used here. It was the best science available at the time of the decisions. It was a reliable proxy for habitat, and so it complied with NIFMA. And very quickly, the notion that there was a violation of NEPA, this Court has never held that the Forest Service, that any agency, cannot respond to comments in an appendix to an environmental impact statement. The Center for Biological Diversity, the Forest Service case, 349F3 at 1165 and 1167, involved a case where comments, there was an appendix, but the appellant's comments weren't in it. They were not addressed at all. As the District Court found, the Forest Service responded in some detail to the appellant's comments throughout this process and amply complied with the purposes and the regulatory text of NEPA. Thank you. Thank you, Mr. Scott. We have some rebuttal remaining. Thank you, Your Honors. First of all, Judge Biden, just let me apologize for getting that citation incorrect during my opening argument. In fact, I believe Judge Graber identified the citation as 204. It is at 204. It is. And it's also in the supplemental excerpt of record at page 74. So it's in the record, actually, the excerpts at two places. But in these documents, the Forest Service, in January of 2007, said that both strata may be misleading, and it said that size density was the best tool available, and it was using size density to revise the forest plan. Let me ask you a question about that. The opposing counsel says that there's a distinction to be drawn from what is said on 204 from vol strata, that 204 refers to timber volume as being misleading. And he says vol strata is more complicated than that because it doesn't rely just on timber volume but has a bunch of other factors in it. So this is true but doesn't really prove your point. So how do you respond to that? Yes, Your Honor. So the simple answer is that the agency's own scientists in 2005 found vol strata to be inaccurate and unreliable. And where is that? The 2005 study is K. Wett et al., and that is at page excerpt of record, page 690. That's the Forest Service's study. And what does the Forest Service say there? The Forest Service, I quote, says, Vol strata masks critical information relevant to modeling wildlife habitat. That's a quote from the Forest Service's own study. So when the Forest Service says there is some other information incorporated into vol strata, that other information does not relate to forest structure, which is the size of the trees, not just the average size of the trees, not just the total volume of wood. So you're saying that's the gist of what's on 204 is that it doesn't? Yes. 204 says timber volume may be misleading, but as I understood the government's counsel to say, timber volume isn't the only thing in vol strata. There were other things that they looked at. That is mentioned in the previous paragraph on page 204. Geology, soil, slope, aspect, elevation, so on. Yes, but those are not the key issues are the forest structure. So what is the average size of the tree? And that is what this agency scientist said in 2005 is missing from vol strata. It doesn't account for tree size because it's the big trees, the old trees that intercept the snow that falls, that allows the deer to use that area during heavy winter snow periods. So by excluding an analysis of how large the average tree is, is this really old growth, big trees? Vol strata doesn't estimate deer habitat quality. Vol strata tells the Forest Service that certain stands are high-quality habitat for deer, and, in fact, they're not because it's a lot of little trees and not fewer big trees. So with my remaining time, I would like to talk briefly about the deer multiplier. And, Your Honors, I think I can simplify this for the Court. Whatever it is that the agency now says it was doing, in the record it's very clear what the agency told the public all along. And what the agency told the public is that the deer multiplier is the maximum carrying capacity and, therefore, has to be correlated with the best score. So this is in the project-specific documents. This is in the T lump. So Excerpt of Record, page 887, Forest Service discusses the deer multiplier as the maximum carrying capacity. At pages 843 to 844 of the Excerpt of Record, the Forest Service stated that the estimate of 100 deer per square mile should be considered a maximum value. In the Excerpt of Record, page 85, it says the same thing. In the 1997 Forest Plan, the Forest Service states that HSI scores, and I quote, were transformed into numbers of deer by multiplying the habitat scores by a maximum long-term carrying capacity, which is the deer multiplier. So if the Forest Service at any point started to use the deer multiplier in a way that was not correlated to maximum long-term carrying capacity, it was doing something that it had specifically told the public it was not doing. And that was both in the DEIS for the Forest Plan and also in the specific project documents. I just want the government's counsel to say that there were comments from the Arizona Department of Fish and Game suggesting that there was a capacity. Alaska, you mean? I'm in Alaska, sorry. We travel too much. I understand. I had an A there and read it as Arizona instead of Alaska, sorry. And that they thought that there was a possible carrying capacity of up to, what, 185? Yes, Your Honor, we addressed this in our reply brief. The potential carrying capacity of 185 was easily discounted by the agency as based on conditions that actually aren't existence on the ground. So I would just ask that you look at our reply brief at page 26, note 13. Right. They rejected the 185, and, in fact, the Forest Service didn't adopt that number. It adopted a much, much lower number. That's right. The 185 number- It didn't go all the way down to 100, apparently. I'm sorry? It just didn't drop it all the way to 100. It apparently ended up at a possible maximum carrying capacity of 130. Well, it was actually, I think, much higher than that at some points. But the point is that the Forest Service throughout this process has told the Forest Service that 100 was the maximum carrying capacity. Its own scientists in 1997, the letter from Dr. Persons, from Dr. Van Bollenberga, from Matt Kirchhoff, they told the agency that 100 was the maximum figure. They said 100 is the maximum figure. The agency has been telling the public the whole time 100 is the maximum figure. And the error, it's an error for the Forest Service to now say, no, in fact, it wasn't a maximum figure. It's somewhere in the middle, and the maximum figure is now somewhere more than 100. That was never told to the public. And that was not what the Forest Service was supposed to be doing with this model. It had represented that it was doing something different. And that's what its scientists thought it was doing. That's what it told the public it was doing at the forest plan stage and in these specific project documents. And so the explanation made by agency counsel conflicts with what's in the actual record for these sales and what the scientists said they were doing at the time. So with that, I see my time has expired. So thank you very much. Thank you very much. We appreciate the arguments of both counsel on this very difficult case. The case is taken under advisement. And we are adjourned for this session. Thank you. All rise.
judges: Alarcon, Graber, Bybee